IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LOBO WELL SERVICE, LLC,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>MARION ENERGY, INC.,<br>Defendant and<br>Counterclaimant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:07-CV-273-TC |

This contract dispute[1] concerns natural gas well drilling services provided by Plaintiff

Lobo Well Service, LLC ("Lobo") to Defendant/Counterclaimant Marion Energy, Inc. ("Marion).

Lobo, in its motion for partial summary judgment,[2] seeks an order requiring Marion to pay a past

due invoice (including interest) for work on Marion's Kenilworth Railroad 15-3 (KRR 15-3)

well.  (Marion disputes that it owes the money.)  Similarly, Lobo seeks a ruling that the

contract's notice provision precludes any dispute by Marion of previously paid invoices for work

on the KRR 15-3 well.  Lobo also seeks a declaration that the contract terms govern Lobo's

drilling work on Marion's Alpine School District 6-17 (ASD 6-17) well even though the ASD 6-

17 well was not listed in the contract.

---

[1]The court has diversity jurisdiction under 28 U.S.C. § 1332, because (1) Lobo is a Utah
limited liability company with its principal place of business in Utah, (2) Marion is a Texas
corporation with its principal place of business in Texas, and (3) the amount in controversy
exceeds $75,000.  (Compl. ¶¶ 1-3; Answer to Compl. & Countercl. ¶¶ 1-3.)

[2](Doc. No. 23.)

Because Marion has established a genuine dispute of material fact concerning whether the contract is voidable based on alleged fraudulent or material misrepresentations, the court DENIES Lobo's motion for partial summary judgment.

Furthermore, the court GRANTS Marion's motion for leave to file a counterclaim for fraudulent inducement,[3] because Marion's request was not unduly delayed or brought in bad faith, will not cause Lobo undue prejudice, and is not futile.

## I. <u>FACTUAL BACKGROUND</u>[4]

In October 2006, Lobo and Marion entered into a standard industry form contract for drilling services (hereinafter "Contract"). Mark Eckels, General Manager of Lobo, and Doug Endsley, Vice President of Operations for Marion, negotiated and executed the Contract. As part of the negotiations, Lobo attached to its drilling bid proposal a list of equipment and supplies it would use in its services to Marion. (See Ex. D-21 attached to Marion's Mem. Opp'n.) That list, titled "Drilling Rig 100 – Inventory," became part of the Contract. The Inventory provided that the "drill string" would include premium drill pipe. Mr. Endsley, of Marion, would not have signed the Contract with Lobo if Lobo did not have premium quality drill pipe as represented in the Contract. According to Marion, the pipe was not premium. (See Marion's Mem. Opp'n at

---

[3](See Marion's Motion for Leave to File an Amended Answer and Counterclaim (Doc. No. 31).)

[4]The facts are taken from the parties' pleadings. Where disputes of material fact exist, the court will identify them. Because Marion is the non-movant, the court lays out the facts and all reasonable inferences from those facts in the light most favorable to Marion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).

25 (undisputed Additional Historical Fact ¶ 79).)[5]

The Contract listed four sites where wells were to be drilled, including the KRR 15-3 well site.[6] The list did not include the ASD 6-17 well site, although the Contract provides that its terms "m[a]y be extended to additional wells by mutual co[n]sent of both parties." (Contract § 1.1, attached as Dep. Ex. 15 to Lobo's Mem. Supp. Mot. Partial Summ. J.)

Lobo began drilling the KRR 15-3 well in November 2006. Eric Norton, Marion's project supervisor, was one of Marion's "company men" on site who observed the drilling operations during his shifts. Beginning in January 2007, while on site, Mr. Norton reviewed and signed "field tickets"[7] prepared by Lobo's representative, Fernando Ortega, approximately every two weeks. The purpose of the field tickets was to list the number of hours for which Marion was to be billed and the amount of downtime for which Marion would not be billed. But the field tickets were not invoices. Indeed, Mr. Norton did not have authority to approve any invoice for payment or authorize any payment, and his job responsibilities did not include reconciling invoices between the parties. Instead, the Contract expressly stated that all invoices for payment were to be sent to Marion's Farmington, New Mexico office where Mr. Endsley would review and determine whether to recommend payment or deny payment. (See Contract § 5.2; Dep. of Doug Endsley (attached as Ex. C-5 to Marion's Mem. Opp'n) at 93.)

---

[5]Because Lobo did not specifically controvert with evidence any of Marion's "Additional Historical Facts," the court deems those facts admitted for purposes of summary judgment. See Local Rule DUCivR 56-1(c).

[6]The other three locations are not relevant here.

[7]Field tickets are sometimes called "field invoices," but they are not to be confused with the actual invoices that Lobo submitted to Marion for payment.

3

On December 13, 2006, before Mr. Norton and Mr. Ortega started using field tickets, Marion received Invoice 2278 from Lobo in the amount of $220,381.70, for work performed on the KRR 15-3 well, and for lodging and per diem costs for workers.  Some time before December 22, 2006, Mr. Endsley disapproved the invoice based on what he believed were problems with the drilling rig and issues concerning downtime.  His assistant, Charlotte Parker, called Tony Wand (who prepared all of Lobo's invoices to Marion) and requested documentation to support the amount billed in Invoice 2278.  According to Ms. Parker, Mr. Wand asked, "Is there any way you can go ahead and pay me for that invoice in full, and then we will take care—and we will credit you on the next invoice." (Dep. of Charlotte Parker at p. 27 (Ex. C-10 to Marion's Mem. Opp'n).)  Marion paid Invoice 2278 based on Mr. Wand's representation that Lobo would provide downtime credit that should have been applied to Invoice 2278 on the next invoice.[8]

When Marion received the next invoice, Invoice 2288, Mr. Endsley disapproved payment of a portion, believing that Invoice 2288, in the amount of $205,724.20, did not reflect the promised credit that should have been, but was not, applied in Invoice 2278.   (See, e.g., Marion's Add'l Historical Facts ¶ 70 ("Mr. Endsley disagreed that 22.5 hours was enough downtime credit for Invoice 2288.").)  Accordingly, on January 29, 2007, Marion paid only a portion of Invoice 2288 ($105,000).  The same day, Marion's CFO, Karl Louman, sent an e-mail to Mr. Wand, advising that Marion would pay only $105,000 and that, "[a]t operational level there are still some issues being discussed regarding 2288 and before." (Jan. 29, 2007 e-mail from Louman to Wand (attached as Ex. D-41 to Marion's Mem. Opp'n.).)  Lobo seeks payment

---

[8]Lobo denies that this conversation ever took place, but it provides no evidence to dispute Ms. Parker's version of the facts.

of the remaining $100,724.20, plus interest.

In January 2007, Mr. Norton, at Mr. Endsley's direction, spoke to Mr. Ortega about the possibility of moving the drilling rig to the ASD 6-17 well site. During those conversations, Mr. Ortega and Mr. Norton discussed some of the problems that had occurred during the drilling of the KRR 15-3 well.  Mr. Norton, in his affidavit, testified that:

> Lobo did not have a premix tank, it did not have a desander, the gun lines on the mud pits were not working, the mud pits had no agitating equipment, and the pumps repeatedly broke down during operations.  In addition, Lobo's drilling crews were inexperienced in handling the brake handle on a drilling rig and would not take or follow instructions on proper drilling techniques.

(Aff. of Eric L. Norton ¶¶ 3-4.  <u>See also</u> Excerpts of Dep. of Natividad Guerrero, attached as Ex. C-1 to Marion's Mem. Opp'n. (discussing problems experienced during drilling of KRR 15-3 well); Excerpts of Dep. of Richard Tatman (Ex. C-2 to Mem. Opp'n) (same); Excerpts of Dep. of Shiloh Williams (Ex. C-3 to Mem. Opp'n) (same); Dep. of Eric Norton (Ex. C-4 to Mem. Opp'n) at pp. 79-80; Marion's Mem. Opp'n, Additional Historical Facts ¶ 75 ("Lobo's mud pumps failed to perform to the capacity Lobo represented and Marion bargained for in the Contract.").)

In response, Mr. Ortega told Mr. Norton that changes would be made to the drilling operations; that Lobo would be getting two new PZ8 mud pumps within two weeks; that Lobo would work on its equipment (including mud pits) to bring it up to standard, including fixing the gun lines and getting agitation equipment in the mud tanks; that Lobo would install a rotary torque gauge on the Lobo drilling rig; and that, upon visiting the ASD 6-17 well site, Lobo could provide the required drilling services.  Based on Mr. Norton's discussions with Mr. Ortega, including the representations regarding the pumps, the mud pits and the rotary torque gauge, he recommended that Marion hire Lobo to drill the ASD 6-17 well site.  Mr. Norton testified in his

affidavit that "[i]f Mr. Ortega had not made the above representations, I would not have recommended to Mr. Endsley that Marion move the Lobo Rig to the ASD 6-17 well site." (Norton Aff. ¶ 20. <u>See also</u> Dep. of Doug Endsley (Ex. C-5 to Mem. Opp'n) at 45 (agreeing that Marion's decision to hire Lobo to drill the ASD 6-17 well was based on "changes that were promised would be made from the way the operation went on the 15-3 to the 6-17 in terms of some of the equipment upgrades.").)

But problems continued.  For example, the new PZ8 pumps did not arrive while Lobo was drilling the ASD 6-17 well.  Lobo did not fix their gun lines so that they worked consistently and it did not install or get any agitation equipment in the mud tanks.  Ultimately, Lobo stopped drilling before the ASD 6-17 well was complete, apparently due to the dispute between the parties.

## II. <u>PROCEDURAL BACKGROUND</u>

On April 25, 2007, Lobo filed a complaint against Marion, asserting claims for breach of contract, account stated, and unjust enrichment.  In May 2007, Marion filed counterclaims against Lobo for declaratory judgment that the Contract was unenforceable, for negligent misrepresentation and for breach of contract, based at that time on what Marion understood to be Lobo's negligent misrepresentation of its equipment and its failure to provide the equipment that was promised in the Contract.  On February 19, 2008, Lobo filed the motion for partial summary judgment at issue here.

On February 22, 2008, Marion received, as part of discovery, three inspection reports purported to reflect the condition of the drill pipe when it was purchased by Lobo back in 2005 and 2006.  According to Marion, the inspection reports provided previously unavailable

information that directly contradicted the Inventory List and Mr. Eckels' deposition testimony. On March 12, 2008, based on the inspection reports, Marion filed its motion to amend its counterclaim to include a claim for fraudulent inducement.  The proposed amended answer and counterclaim contains allegations that are essentially an extension of Marion's negligent misrepresentation claim.

### III. <u>ANALYSIS</u>

**A.   <u>Lobo's Motion for Partial Summary Judgment</u>**

In its Motion for Partial Summary Judgment, Lobo contends that (1) Marion is liable as a matter of law for the unpaid amount of $100,724.20 (plus interest) on Invoice 2288; (2) Marion is precluded as a matter of law from disputing any paid invoices on the KRR 15-3 well; and (3) as a matter of law, the Contract also governs the parties' actions concerning the ASD 6-17 well. Lobo's claims for unpaid invoices and a ruling that the Contract governs the drilling services for the ASD 6-17 well are based on the premise that the Contract is valid and enforceable.

Marion contends that Lobo improperly induced Marion to enter into the Contract through the use of material or fraudulent misrepresentations.  Such a situation would make the Contract voidable.  If the Court finds that the Contract was fraudulently induced, Lobo's claims may be moot.  Even if the Contract is not voidable, Lobo's claim for damages is premature.  Based on Marion's claims in this case, there are questions of fact about whether Lobo is entitled to payment and what amount of damages, if any, should be awarded to Lobo.  For these reasons, as described in more detail below, the court denies Lobo's motion for partial summary judgment.

**1.   Legal Standard**

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

    **2.**      **The Contract and Fraudulent Inducement**

At this stage, Marion's negligent misrepresentation and fraudulent inducement claims preclude Lobo's ability to enforce the Contract. If Lobo fraudulently induced Marion to enter into the Contract or hire Lobo to drill the ASD 6-17 well, the Contract and the drilling agreement for the ASD 6-17 well (whether governed by the Contract or not) are voidable. "If a party's manifestation of asset is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Miller v. Celebration Mining Co., 29 P.3d 1231, 1235 (Utah 2001) (quoting Restatement (Second) of Contracts § 164(1) (1981)). A voidable contract gives the injured party the right to either affirm the contract and seeks damages or to avoid the contract altogether (i.e., a right to rescind). Id. at 1235-36; Continental Ins. Co. v. Kingston, 114 P.3d 1158, 1161, 1161 n.6 (Utah Ct. App. 2005). The nature of Marion's claim, and the rights arising out of it, preclude

a finding of summary judgment on Lobo's claims.  See TS 1 Partnership v. Allred, 877 P.2d 156,

159 (Utah Ct. App. 1994) (holding that fraud in the inducement counterclaim precluded a finding

of summary judgment on plaintiff's breach of contract claim).

Lobo contends that Marion may not rely on its fraudulent inducement claim because it

has not yet been pleaded (it awaits approval by the court allowing Marion leave to amend).  Even

if this is true (and the court is not convinced that it is), Lobo fails to acknowledge that courts

recognize negligent misrepresentation (which has already been pleaded by Marion in its existing

counterclaim) as a means to induce someone to enter into a contract.  For example, the

Restatement (Second) of Contracts notes that "[i]f a party's manifestation of assent is induced by

either a fraudulent or a material misrepresentation by the other party upon which the recipient is

justified in relying, the contract is voidable by the recipient."  Restatement (Second) of Contracts

§ 164(1) (1981) (emphasis added).  The comment to the Restatement notes that a "representation

need not be fraudulent in order to make a contract voidable under the rule stated in this Section."

Id. Cmt. b.  The only difference is that a non-fraudulent misrepresentation must be material.  Id.

Marion has presented evidence that it would not have entered into the Contract (or hired Lobo to

drill the ASD 6-17 well) if it had known that the representations were not true.  This is sufficient

to overcome Lobo's motion for partial summary judgment at this stage.

Lobo also contends that because Marion has elected to sue on the contract and seek

damages, it has elected its remedy and may not bring an inconsistent claim of rescission.  Lobo's

argument is contrary to the modern rules of pleading.  Application of the doctrine of election of

remedies to prevent parties from pleading inconsistent theories of relief "'has been eviscerated by

the permissive rules of pleading under Fed. R. Civ. P. 8(a) and 8(e)(2).'"  In re Grain Land Coop,

978 F. Sup. 1267, 1278 (D. Minn.) (quoting <u>Kansas State Bank v. Citizens Bank</u>, 737 F.2d 1490,

1499 (8th Cir. 1984)).  <u>See also</u> <u>Smoot v. Lund</u>, 369 P.2d 933, 934-35 (Utah 1962) ("[O]ur Rules

of Civil Procedure . . . show a clear purpose to eliminate rigidity of rules and technical objections

as to the form or nomenclature of claims for relief. . . . This is so even where the claims might be

deemed inconsistent."); <u>Conder v. A.L. Williams & Assocs., Inc.</u>, 739 P.2d 634, 639 (Utah Ct.

App. 1987) ("The choice of remedy belongs to the victim of the fraud, and a choice cannot be

forced upon him."); (<u>Automobile Ins. Co. of Hartford, Conn. v. Barnes-Manley West Wash</u>

<u>Laundry Co.</u>, 168 F.2d 381, 386-87 (in fraudulent inducement and breach of contract case,

appellate court recognized right of litigant to argue inconsistent theories even as far into the

litigation as the appeal: "[T]he right to plead inconsistent causes of action and to seek relief in

the alternative given by the Rules of Civil Procedure is not limited to trial in the District

Courts."); <u>The Pantry, Inc. v. Stop-N-Go Foods, Inc.</u>, 777 F. Supp. 713, 718 (S.D. Ind. 1991)

("When a matter is in the pleading stage, a plaintiff may plead alternative legal and equitable

theories of relief because it is unclear which remedy will be supported by the evidence.  A party

must elect between inconsistent forms of relief when both forms of relief become ripe to choose

between them.").

     **3.**     **The Contract and Procedure for Disputing Invoices**

     Even assuming the Contract is not voidable, Lobo is not entitled to summary judgment at

this stage.

     Lobo contends that Marion's failure to strictly comply with the Contract's notice

provision means that Marion has waived its right to dispute Invoice 2288 and so Marion must

pay the past due amount plus interest.  In support of its position, Lobo points to the Contract's

section titled "Disputed Invoices and Late Payment, which provides that Marion (the "Operator")

> shall pay all invoices within 30 days after receipt <u>except that if Operator disputes
> an invoice or any part thereof, Operator shall, within fifteen days after receipt of
> the invoice, notify Contractor [Lobo] of the item disputed, specifying the reason
> therefor</u>, and payment of the disputed item may be withheld until settlement of the
> dispute, but timely payment shall be made of any undisputed portion.  Any sums
> (including amounts ultimately paid with respect to a disputed invoice) not paid
> within the above specified days shall bear interest at the rate of 1.5 percent or the
> maximum legal rate, whichever is less, per month from the due date until paid.  If
> Operator does not pay undisputed items within the above stated time, Contractor
> may suspend operations or terminate this Contract[.]

(Contract § 5.2 (emphasis added).)  Then Lobo points to the Contract's provision setting forth the

proper form of notice: "<u>Notices</u>, reports, and other communications <u>required</u> or permitted <u>by this</u>

<u>Contract</u> to be given or sent by one party to the other <u>shall be</u> delivered by hand, mailed, digitally

transmitted or telecopied . . . ." (<u>Id.</u> § 24 (emphasis added).)

But the language in the above-quoted sections does not say that an untimely protest

results in an admission that the amount in the invoice is correct.  The Contract is silent on the

issue of the consequences, if any, for failure to strictly comply.  "[W]here there is doubt about the

interpretation of a contract, a fair and equitable result will be preferred over a harsh and

unreasonable one.  And an interpretation that will produce an inequitable result will be adopted

only where the contract so expressly and unequivocally so provides that there is no other

reasonable interpretation to be given it."  <u>Peirce v. Peirce</u>, 994 P.2d 193, 198 (Utah 2000).

The court holds that, if the Contract is not voided, the notice provision does not preclude

Marion from challenging the amount due under Invoices 2278 and 2288.  Indeed Marion has

presented evidence establishing a question of material fact whether the amounts in Invoices 2278

and 2288 were accurate.  That leaves a genuine dispute of material fact regarding the amount of

damages, if any, due Lobo, and the amount of off-set, if any, that Marion may claim.  In other words, even assuming the Contract is not voidable, or if Marion demonstrates that the Contract is voidable but elects to ratify the Contract and seek damages for breach, the issue of damages must be left for the jury to decide.  See Sohm v. Dixie Eye Center, 166 P.3d 614, 619 (Utah Ct. App. 2007) ("'When the matter of damages is in dispute, it is an issue upon which the parties are entitled to a jury trial, the same as on other disputed issues of fact.'") (quoting Mel Hardman Prods., Inc. v. Robinson, 604 P.2d 913, 918 (Utah 1979)).

And even if Lobo's interpretation is correct, a question of fact exists concerning whether Mr. Ward made representations to Marion that excused strict compliance with the notice provision and whether Lobo reasonably relied on those alleged representations.

Also, Marion has presented enough evidence to raise a question of fact about whether Marion was fraudulently induced to enter into the Contract and to hire Lobo to drill the ASD 6-17 well.  (The court need not reach the question of whether the Contract governs the ASD 6-17 well, because the spectre of fraudulent inducement hangs over both projects and the same issues would apply regardless of which contractual terms govern the ASD 6-17 well.)

Furthermore, Marion has presented sufficient evidence to challenge Lobo's premise that it is entitled to the damages sought.  That is, Marion provides evidence showing that Lobo may have breached the Contract.  Accordingly, another question of fact exists about whether Lobo is entitled to damages.

For all of the foregoing reasons, Lobo's Motion for Partial Summary Judgment is denied.

**B.**     **Marion's Motion for Leave to File an Amended Answer and Counterclaim**

Leave to amend pleadings "shall be freely given when justice so requires."  Fed. R. Civ.

P. 15(a).  Courts generally will only refuse a leave to amend upon a "showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." Duncan v. Manager, Dept. of Safety, City & County of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005).

Given the short time between when Marion learned of the alleged fraudulent misrepresentations and the date it filed its motion for leave to amend, the court finds that there has been no undue delay.  Nor is there evidence of bad faith or dilatory motive.  (Failure to cure deficiencies is not relevant here.)

Lobo claims that it would be unduly prejudiced by allowing Marion to bring the new claim at this late stage in the litigation.  While it is true that discovery (on the new issues only) may have to be re-opened, that is not unduly prejudicial, particularly because the new allegations are essentially an extension of Marion's existing negligent misrepresentation claim. See, e.g., Gillette v. Tansy, 17 F.3d 308, 313 (10th Cir. 1994) (finding no evidence of prejudice when amended claims "track the factual situations set forth in [the original] claims.").

Finally, Marion's proposed amendment is not futile.  Lobo challenges the proposed allegations by arguing that they are not supported by the evidence.  But a court determining whether a proposed claim is futile must take the pleadings as true and evaluate them as it would evaluate a pleading challenged in a motion to dismiss. E.g., Anderson v. Suiters, 499 F.3d 1228, 1238 (10th Cir. 2007).  As pleaded, Marion's claim for fraudulent inducement would not be subject to dismissal.

For the foregoing reasons, Marion's Motion for Leave to Amend is GRANTED. If the parties wish to re-open discovery for the limited purpose of addressing the new fraudulent

inducement claim, they should submit a proposal to the court for consideration.

## ORDER

For the foregoing reasons, Lobo Well Service, LLC's Motion for Partial Summary Judgment re: (1) Amount Owing for Work on the KRR 15-3 Well; and (2) Applicability of the Contract to the ASD 6-17 Well (Doc. No. 23) is DENIED.  Marion Energy, Inc.'s Motion for Leave to File an Amended Answer and Counterclaim (Doc. No. 31) is GRANTED.

SO ORDERED this 21st day of August, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

14